**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| A.W.G. DEWAR, INC., and INTACT INSURANCE GROUP USA LLC<br><br>*Plaintiff*,<br><br>v.<br><br>MOLLY MASTRIANNI,<br><br>*Defendant.* | Case No. 26-14269 |

**COMPLAINT FOR MONEY DAMAGES AND INJUNCTIVE RELIEF**

Plaintiff A.W.G. Dewar, Inc. ("Dewar") and its affiliate Intact Insurance Group USA LLC ("Intact") (collectively, "Plaintiffs") bring this action against Defendant Molly Mastrianni ("Defendant") seeking money damages for violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.* ("DTSA"), M.G.L. c. 93 §42, *et seq*., Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"), and common law; a temporary restraining order; and preliminary and permanent injunctive relief. This case is about a disgruntled former employee's—Defendant's—theft and misuse of Dewar's trade secrets and confidential and proprietary information to interfere with Dewar's advantageous business relationships and to unfairly compete with Dewar.

After years of providing Defendant feedback concerning her poor performance and seeing little to no improvement, Dewar terminated Defendant's employment on April 17, 2026. During the termination meeting, Defendant feigned ignorance of her performance deficiencies. Following her termination, Dewar disabled Defendant's computer access and internal login credentials. However, nearly a week after her termination, Defendant "discovered" that her login credentials for Dewar's client information database—Constant Contact—still worked. Without authorization from Dewar, Defendant accessed the Constant Contact database and stole Dewar's trade secrets

and confidential and proprietary information. She has since used Dewar's secret information—which it has spent millions of dollars over years to compile—to solicit Dewar's clients and unfairly compete with Dewar, causing financial harm to Dewar within the highly-specialized tuition refund insurance industry.

## I. PARTIES, JURISDICTION, AND VENUE

1. Dewar is incorporated under the laws of the Commonwealth of Massachusetts, with its principal place of business located in Quincy, Massachusetts.

2. Intact is incorporated under the laws of the State of Delaware, with its principal place of business located in Plymouth, Minnesota.

3. Dewar is an affiliate of Intact. At all relevant times, Dewar employed Defendant. Dewar operates as part of Intact's organization, and Intact and Dewar share confidential information, business relationships, goodwill, and other protectable business interests.

4. Defendant is an individual who, on information and belief, resides at 745 E 5th St Apt 1, South Boston, MA 02127-3262.

5. This is an action in law and equity pursuant to which Plaintiffs seek relief, including permanent injunctive relief, based on Defendant's tortious interference with economic advantage and violations of the DTSA and CFAA.

6. This Court has subject matter jurisdiction over this lawsuit because Plaintiffs assert claims under federal statutes.

7. This Court has personal jurisdiction over Defendant and venue is proper in this District because (a) Defendant is a resident of Massachusetts; and (b) this lawsuit arises from Defendant's theft of Dewar's secret information while, on information and belief, she was in Massachusetts.

## II. FACTS

## THE SPECIALIZED TUITION REFUND INSURANCE MARKET

8. Plaintiffs reallege and incorporate by reference, each and every foregoing allegation, as if fully set forth herein.

9. The private school tuition refund insurance market is a highly specialized niche within the broader property and casualty insurance industry.

10. Unlike traditional personal or commercial insurance lines that are marketed to broad segments of consumers and businesses, tuition refund insurance is specifically designed for educational institutions, particularly independent schools, private schools, and boarding schools.

11. The product protects against the financial consequences associated with student withdrawals, dismissals, or other covered events that may interrupt enrollment and affect tuition obligations.

12. As a result, insurers operating in this sector must possess specialized knowledge regarding school operations, enrollment practices, tuition contracts, retention risks, and the financial structures used by educational institutions.

13. Participation in this market requires more than general insurance expertise.

14. There are approximately 30,000 private schools in the United States. However, only approximately 1,200 of those schools utilize this specialized insurance product.

15. Because the potential customer base is limited to a fractional subset of educational institutions, successful underwriting and marketing depend upon detailed knowledge of which schools maintain tuition refund programs, which schools do not currently offer such coverage, when tuition contracts are renewed, and who within each institution is responsible for insurance purchasing decisions.

16. Developing these relationships often requires years of industry experience, targeted marketing efforts, attendance at educational-industry conferences, and sustained interaction with school administrators, business officers, and risk-management personnel.

17. Likewise, developing prospective customers requires years of educating the customer about the value of the insurance product, identifying the correct personnel at the schools on whom to focus these efforts, and overcoming years of institutional practice of not having this insurance.

18. The value of the information described above derives not merely from identifying schools generally, but from knowing which institutions are current or prospective purchasers of tuition refund insurance and understanding their particular coverage needs.

19. Because the market is limited and specialized, opportunities to obtain new clients are correspondingly scarce.

20. Unlike mass-market insurance products that may be sold through broad advertising or large broker networks, tuition refund insurance providers compete for a finite number of schools and educational institutions.

21. Knowledge regarding existing customers, prospective customers, key decision-makers, renewal schedules, pricing strategies, and schools that may be considering changing providers possess substantial competitive value within the industry.

22. A competitor with access to such information would be able to target solicitation efforts more effectively than a company lacking comparable market intelligence. For example, a competitor without this information would be required to cold call 30,000 schools to determine which 4% of them are likely to be interested in this insurance product, in addition to determining which school official is the appropriate contact point.

23. In short, tuition refund insurance is not a general insurance product sold to the public at large. It is a specialized insurance line serving a narrowly defined segment of the educational sector, and success within that market depends heavily on specialized industry knowledge, long-standing customer relationships, and familiarity with a limited pool of potential clients.

**DEWAR'S RELEVANT BUSINESS**

24. Plaintiffs reallege and incorporate by reference, each and every foregoing allegation, as if fully set forth herein.

25. Within the tuition refund insurance market, Dewar's business centers on developing, marketing, and servicing tuition refund programs for educational institutions throughout the United States.

26. Dewar maintains relationships with schools that offer tuition refund protection to enrolled families and works directly with educational institutions concerning policy placement, renewals, coverage administration, and claims arising from student withdrawals or dismissals.

27. Dewar is the preeminent tuition refund insurance provider in the country. Of the approximately 1,200 schools opting for such coverage, Dewar insures approximately 1,100 of those schools.

28. The average customer relationship is approximately 33 years.

29. Dewar's success depends on its ability to identify prospective institutional clients, maintain long-term relationships with existing school accounts, and understand the specific operational and financial needs of individual educational institutions.

30. To ensure success, Dewar's personnel work with school administrators and other decision-makers responsible for evaluating, selecting, and renewing tuition refund insurance

programs. Because tuition refund insurance is sold on an institutional basis, Dewar's business relies heavily on account development, customer retention, and knowledge of schools' purchasing practices.

31. Dewar has spent millions dollars developing and compiling information concerning existing customers, prospective customers, renewal opportunities, decision-makers, and schools' insurance requirements. Dewar's list of current customers, standing alone, is worth millions of dollars to a competitor.

32. That information, and the secrecy thereof, is directly relevant to Dewar's ability to compete and grow its business. Such information also enables Dewar to target marketing efforts, service existing accounts, and pursue new business opportunities more effectively.

33. In addition, Dewar has developed a significant presence in the educational-services market through the offering of Tuition Refund Plans to private schools.

34. Its business model depends not only on underwriting expertise, but also on maintaining and expanding relationships within the educational community and leveraging its knowledge of institutions that are potential purchasers of tuition refund coverage.

**DEFENDANT'S JOB AT DEWAR**

35. Plaintiffs reallege and incorporate by reference, each and every foregoing allegation, as if fully set forth herein.

36. Dewar hired Defendant as an Account Executive on or about July 18, 2022.

37. As an Account Executive, Defendant was responsible for managing existing school accounts, developing new business opportunities, and servicing educational institution clients within her assigned territory.

38. In that role, Defendant acted as a principal point of contact between Dewar and approximately 119 of its existing customers.

39. Defendant used Dewar’s goodwill to develop and maintain relationships with educational institutions that purchased or were prospective purchasers of Dewar's Tuition Refund Plan products.

40. Defendant’s responsibilities also included identifying prospective customers, cultivating relationships with school decisionmakers, soliciting new business, preparing proposals and presentations, responding to requests for information, assisting with policy renewals, servicing existing accounts, and working to retain and expand customer relationships.

41. Defendant regularly communicated with school administrators, business officers, chief financial officers, enrollment professionals, and other personnel responsible for evaluating, purchasing, administering, and renewing tuition refund insurance programs.

42. Through her position, Defendant obtained access to extensive trade secret, confidential, and proprietary information belonging to Dewar that was not generally known to the public or readily ascertainable by competitors.

43. Among other things, Defendant had access to Plaintiff’s confidential information including the identities of Dewar’s existing customers and prospective customers, in addition to the identity of decision-makers at current customers, customer preferences, purchasing histories, renewal schedules, business opportunities, pricing information, business strategies, sales strategies, claims-related information, and competitive intelligence.

44. The information to which Defendant had access is non-public, including information identifying the specific educational institutions that purchased or were considering purchasing tuition refund insurance products, the individuals responsible for making purchasing

decisions at those institutions, and information concerning those institutions' insurance needs, coverage preferences, budgets, and renewal timelines.

45. During her employment, Defendant utilized Dewar's goodwill, customer relationships, and marketing databases—including Constant Contact.

46. Defendant was the only Account Executive at her level to have access to Constant Contact. When her supervisor went out on leave, Defendant was given access, so she could manage the marketing campaigns.

47. Constant Contact is a password protected database containing the contact and marketing information for all of Dewar's current and prospective customers.

48. Only three (3) people at Dewar have access to Constant Contact, all of whom are more senior than Defendant.

49. To access Dewar's Constant Contact database, an employee must input their login credentials, which includes their official Dewar email address and a unique password.

50. Constant Contact contains detailed information regarding Dewar's customers and prospective customers, including customer names, prospective customer names, individual contacts, titles, email addresses, mailing addresses, and other information that Dewar had compiled and maintained through substantial time, effort, and expense.

51. Constant Contact also contains all of Dewar's past and current email-marketing campaign materials.

52. Defendant used and had access to Constant Contact in connection with her duties managing marketing campaigns, customer relationships, developing new business opportunities, and servicing existing accounts while her supervisor was on leave.

53. Defendant also had access to information concerning prospective business opportunities, marketing initiatives, customer retention efforts, and strategic plans designed to increase Dewar's market share within the tuition refund insurance industry.

54. Defendant did not bring any connections or prospective customers to Dewar when she began her employment, as she had just finished an advanced degree related to teaching.

55. Upon information and belief, Defendant had not previously worked in the tuition refund insurance industry.

56. The information to which Defendant had access derived independent economic value from not being generally known to Dewar's competitors. Such information allows Dewar to identify and contact prospective customers, maintain and expand existing customer relationships, target business opportunities, and compete effectively within a limited and highly specialized market.

57. Dewar developed and maintained this information through substantial investments of time, money, effort, and goodwill accumulated over many years of serving educational institutions throughout North America.

58. Dewar treated this information as confidential and took reasonable measures to protect it from unauthorized disclosure and use, including password protections and limiting the number of employees that could access the information.

59. Among other measures, Dewar maintained policies and procedures governing the use, protection, and disclosure of confidential business information and required employees to maintain the confidentiality of proprietary company information obtained during the course of their employment.

60. Defendant was made aware of Dewar's confidentiality policies through the employee handbook and related employment materials provided during her employment.

61. Through her employment, Defendant understood that customer information, prospect information, pricing information, business strategies, renewal information, and other non-public business information belonged to Plaintiffs, was confidential in nature, and was not to be disclosed or used for purposes other than advancing Dewar's business interests.

62. By virtue of her position and tenure with Dewar, Defendant acquired specialized knowledge concerning Dewar's customers, prospective customers, business operations, sales efforts, and strategic marketing initiatives that would be valuable to a competitor operating in the highly-specialized tuition refund insurance market.

63. Defendant used Dewar's substantial goodwill, on Dewar's behalf, with existing and prospective customers. Through repeated communications and ongoing account management responsibilities, Defendant became familiar with the needs, preferences, concerns, and purchasing practices of the schools she serviced.

64. The relationships Defendant made during her employment were developed through Dewar's substantial investments of time, money, resources, confidential information, and business opportunities and were maintained for Dewar's benefit.

65. As a result of her position, Defendant became familiar with the identities of key contacts at customer and prospective customer institutions, including those individuals responsible for evaluating, recommending, and purchasing tuition refund insurance products.

66. Defendant also became familiar with the timing of renewal opportunities, the competitive landscape surrounding particular accounts, customer satisfaction issues, and the factors that influenced purchasing decisions at individual schools.

67. The confidential information and goodwill entrusted to Defendant provided her with knowledge that could be used to assist a competing business in identifying prospective customers, targeting existing Dewar customers, tailoring competitive sales efforts, and improving the likelihood of securing business from educational institutions known to be actual or potential purchasers of tuition refund insurance products.

68. Dewar entrusted Defendant with access to its confidential and proprietary information for the sole purpose of allowing her to perform her duties as an Account Executive and further Dewar's business interests.

69. At all relevant times, Defendant owed duties of loyalty, confidentiality, and trust with respect to the trade secret, confidential, and proprietary information made available to her during her employment.

## DEFENDANT'S TERMINATION AND NEW EMPLOYMENT

70. Plaintiffs reallege and incorporate by reference, each and every foregoing allegation, as if fully set forth herein.

71. After years of underperformance and ample chance to implement the repeated feedback she received during her employment, Dewar determined that Defendant could not successfully perform as an Account Executive.

72. As such, on or about April 17, 2026, Dewar terminated Defendant's employment for poor performance.

73. Following her termination, Dewar deactivated Defendant's internal login credentials and her Dewar-owned computer.

74. However, five days after her termination, on April 22, 2026, Defendant accessed Dewar's Constant Contact account through her Dewar login credentials.

75. During this unauthorized access, Defendant copied, exported, and/or otherwise misappropriated the identities of the educational institutions that were Dewar's current and prospective customers, each contact at the institutions, each contact's job title, and each contact's email address.

76. Defendant had no legitimate purpose to access Constant Contact; her only possible reason for doing so was to obtain the information described immediately above. When questioned about her accessing Constant Contact post-termination, Defendant could not provide any logical excuse or explanation.

77. Upon information and belief, Defendant began working for one of Dewar's newest competitors, Vertical Insure, Inc. ("Vertical") shortly after leaving Dewar.

78. Upon information and belief, Defendant was hired for the experience she gained at Dewar in the tuition refund insurance industry.

## VERTICAL'S RELEVANT BUSINESS

79. Plaintiffs reallege and incorporate by reference, each and every foregoing allegation, as if fully set forth herein.

80. Vertical is a relatively recent entrant into the tuition refund insurance industry, having been founded in or around 2022.

81. Upon information and belief, Vertical has actively sought to expand its presence within the tuition refund insurance market by offering tuition refund protection products and related services to private educational institutions throughout the United States.

82. Vertical competes directly with Dewar for relationships with educational institutions that purchase, administer, or are considering tuition refund insurance products.

83. Upon information and belief, Vertical's business strategy includes identifying, soliciting, and developing relationships with schools that currently maintain tuition refund programs, as well as schools that may be prospective purchasers of such coverage.

84. Upon information and belief, Vertical seeks to increase its market share by developing relationships with school administrators, business officers, enrollment personnel, chief financial officers, and other individuals responsible for evaluating and purchasing tuition refund insurance products on behalf of educational institutions.

85. Upon information and belief, Vertical has devoted substantial resources toward increasing its presence within the tuition refund insurance market and taking business from competitors servicing educational institutions that currently purchase or may purchase tuition refund insurance products.

86. Upon information and belief, because the tuition refund insurance market is limited to a relatively small number of educational institutions, each customer obtained by Vertical represents a significant competitive opportunity.

87. Upon information and belief, Vertical targets many of the same educational institutions that Dewar presently serves, has previously served, or seeks to serve.

88. Upon information and belief, Vertical's efforts to grow its business depend, at least in part, on identifying educational institutions that currently maintain tuition refund programs and persuading those institutions to select Vertical rather than competing providers.

89. Information concerning the identities of schools that currently purchase tuition refund insurance, schools that are prospective purchasers of tuition refund insurance, the timing of policy renewals, the identities of individuals responsible for purchasing decisions, schools'

historical purchasing practices, schools' coverage preferences, and other customer-specific information would be highly valuable to Vertical in competing against Dewar.

90. Access to such information would permit Vertical to focus its sales and marketing efforts on institutions known to be actual or likely purchasers of tuition refund insurance, thereby drastically reducing the time, expense, and resources otherwise required to identify and cultivate prospective customers.

91. As Vertical is a newer participant in the tuition refund insurance market, access to established customer relationships, prospective customer information, renewal information, and industry-specific market intelligence would provide Vertical with a substantial competitive advantage.

92. Vertical has publicly promoted itself as an alternative to established tuition refund insurance providers and has sought to attract schools that currently utilize competing tuition refund insurance products.

93. The confidential information and trade secrets to which Defendant had access during her employment with Dewar—and which she misappropriated after her termination through her unauthorized access to Dewar's Constant Contact database—including information concerning the identities of customers and prospective customers, the identities of decision-makers at customers and potential customers, purchasing contacts, renewal opportunities, and marketing strategies, would be directly useful to Vertical in competing against Dewar and soliciting business from educational institutions within the tuition refund insurance market.

## <u>DEFENDANT'S EMPLOYMENT WITH VERTICAL</u>

94. Plaintiffs reallege and incorporate by reference, each and every foregoing allegation, as if fully set forth herein.

95. Upon information and belief, Vertical hired Defendant in or around May 2026 as its School Partnerships & Growth Lead for its tuition refund insurance business.

96. Upon information and belief, Defendant's new position involves responsibilities that are substantially similar to those she performed for Dewar and that will require her to call upon many of the same skills, relationships, and industry contacts that she developed while employed by Dewar.

97. Further, as a result of Defendant's misappropriation of Dewar's trade secrets and confidential and proprietary information, she possesses non-public information that she could use to unfairly benefit Vertical and disadvantage Dewar in competition for existing and prospective customers.

98. In fact, Defendant has solicited multiple of Dewar's current customers since joining Vertical.

99. Defendant had no way of knowing the identities of these customers or their decision-makers but for using Dewar's trade secret, confidential, and proprietary information to solicit Dewar's customers in an attempt to steal the business from Dewar.

100. Upon information and belief, Defendant, acting as an agent of Vertical, has revealed Dewar's trade secret, confidential, and proprietary information to her new employer, Vertical.

101. Defendant's conduct has caused considerable harm to Dewar, including but not necessarily limited to the following:

A. the disclosure of Dewar's trade secret, confidential, and/or proprietary information;

B. the theft of Dewar's trade secrets, whose value greatly exceeds $1 million and took years to develop;

C. the violation and misappropriation of Dewar's internal systems;

D. the diversion of Dewar's business opportunities;

E. the disruption of Dewar's relationships with current and prospective clients and the usurpation of Dewar's goodwill with current and prospective clients; and

F. present economic loss which is unascertainable at this time and may never be ascertainable, as well as future economic loss which is also presently incalculable.

## III. CLAIMS

### <u>COUNT I – Misappropriation of Trade Secrets in Violation of the DTSA</u>

102. Plaintiffs reallege and incorporate by reference, each and every foregoing allegation, as if fully set forth herein.

103. The DTSA forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate of foreign commerce."

104. "Trade secrets" are broadly defined under the DTSA to include "all forms and types of financial, business, scientific, technical, economic or engineering information."

105. As described above, certain of Dewar's confidential and proprietary information constitutes trade secrets related to a product or service used in, or intended for use in, interstate commerce, including but not limited to information regarding Dewar's clients, prospective clients, pricing, client preferences, and business strategies.

106. Dewar takes reasonable measures to protect the secrecy of such information. These measures include password-protected databases, confidentiality policies, and other corporate policies and related training, and limitations on dissemination of information on a need-to-know basis.

107. Defendant knew that she had a duty to maintain the secrecy of Dewar's trade secrets, in part, through Dewar's and Intact's corporate policies.

108. Upon information and belief, Defendant uses Dewar's trade secret information for her benefit or for the benefit of another party, without Dewar's consent or authorization, and in a manner that will cause, and has caused, irreparable harm to Dewar.

109. Defendant's actions constitute willful and/or malicious actual and continuing misappropriation in violation of the DTSA.

110. Dewar is entitled to actual damages from Defendant and an award of its reasonable attorneys' fees.

111. Dewar's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

112. Defendant's actions will continue to cause irreparable harm and damages to Dewar and its trade secret information if not restrained.

**COUNT II – Common Law Misappropriation of Confidential and Proprietary Information**

113. Plaintiffs reallege and incorporate by reference, each and every foregoing allegation, as if fully set forth herein.

114. Dewar owns confidential and proprietary information as described herein.

115. Defendant was provided with access to the confidential and proprietary information owned by Dewar in the course of her employment.

116. Defendant is obligated to maintain the confidentiality of the proprietary and confidential information she received from Dewar in the course of her employment and is not permitted to use or disclose this information for her own benefit, or for the benefit of any third party.

117. Defendant misappropriated the confidential and proprietary information she received from Dewar by taking it from Dewar's secure system without Dewar's consent or authorization.

118. Defendant has used or intends to use Dewar's confidential and proprietary information for her benefit, or for the benefit of another party, without Dewar's consent or authorization and in a manner that will cause irreparable harm to Dewar.

119. By reason of this wrongful conduct, Defendant has misappropriated the confidential and proprietary information she received from Dewar in violation of the common law.

120. Defendant acted willfully and maliciously when she misappropriated Dewar's confidential and proprietary information.

**COUNT III – Misappropriation of Trade Secrets in Violation of M.G.L. c. 93 § 42**

121. Plaintiffs reallege and incorporate by reference, each and every foregoing allegation, as if fully set forth herein.

122. Dewar provided information to Defendant during her employment that constitutes a trade secret under Massachusetts law.

123. Defendant gained access to and learned Dewar's trade secrets in confidence and was under a duty not to use or disclose Dewar's trade secrets without Dewar's authorization and consent.

124. Defendant misappropriated Dewar's trade secrets by improperly using and disclosing them, and by continuing to improperly use and disclose them, without Dewar's consent or authorization.

125. Because of her wrongful conduct, Defendant misappropriated Dewar's trade secrets in violation of M.G.L. c. 93, § 42.

126. Defendant acted willfully and maliciously when she misappropriated Dewar's trade secrets.

127. Defendant's misappropriation was and is a substantial factor in directly and proximately causing damages and irreparable harm to Dewar.

128. Dewar has been and continues to be irreparably harmed by Defendant's actions.

**COUNT IV – Computer Fraud And Abuse Act – 18 U.S.C. § 1030**

129. Plaintiffs reallege and incorporate by reference, each and every foregoing allegation, as if fully set forth herein.

130. Dewar's trade secret, confidential, and proprietary information is stored on Dewar's computer system that is used in or affects interstate commerce and is used to access the internet. Dewar's property and/or its computer system is a "protected computer" within the meaning of the CFAA.

131. Defendant violated the CFAA when she knowingly, intentionally, and without authorization accessed Dewar's secure Constant Contact database following her termination.

132. Dewar has suffered damages and/or loss as a result of Defendant's unauthorized access to Dewar's computer systems and/or secure Constant Contact database.

133. Pursuant to the CFAA, Dewar is entitled to recover damages against Defendant.

134. Dewar seeks recovery to the full extent permitted by the CFAA, including by not limited to loss aggregating at least $5,000 in value, including the cost of responding to and investigating the unauthorized access.

135. Pursuant to the CFAA, Dewar is entitled to temporary and permanent injunctive relief enjoining Defendant from making any further use of Dewar's property—i.e., trade secret, confidential, and proprietary information.

**COUNT V – Tortious and Intentional Interference with Advantageous Relationships**

136. Plaintiffs reallege and incorporate by reference, each and every foregoing allegation, as if fully set forth herein.

137. At all relevant times, Defendant knew or should have known of an advantageous relationship between Dewar and its customers and prospective customers.

138. Despite such knowledge, Defendant interfered with these relationships by engaging in the conduct described above.

139. Such interference was intentional, malicious, and without legal justification; and was conducted by unlawful means for an illegal purpose.

140. Defendant's interference with Dewar's advantageous economic relationships is a substantial factor in directly and proximately causing damages and irreparable harm to Dewar.

141. Dewar has been and continues to be irreparably harmed by Defendant's actions.

**REQUESTS FOR RELIEF**

WHEREFORE, Dewar requests that this Court award the following relief:

A. Issue temporary, preliminary, and permanent injunctive relief restraining Defendant from using or disclosing any of Dewar's confidential, proprietary, or trade secret information which includes, but is not limited to, prohibiting Defendant from contacting any school contained within Dewar's Constant Contact database and from sharing any information about said schools with Vertical;

B. Issue an immediate order requiring Defendant to:

- Preserve all electronic evidence related to the above allegations;
- Return any electronic device that contains Dewar's information; and
- Engage in expedited discovery.

C. Enter judgment in favor of Dewar on all Counts in the present Complaint;

D. Award damages to Dewar in an amount to be determined at trial;

E. Award Dewar its costs, interest, and reasonable attorneys' fees;

F. Award such other and further relief as the Court deems necessary and appropriate.

Dewar reserves its right to a jury trial on all claims so triable.

Date: September 17, 2026

Respectfully Submitted,

A.W.G. Dewar, Inc. and Intact Insurance Group USA LLC

By their attorneys,

*/s/Garrett A.D. Gee*
Erik Winton, BBO #600743
Garrett A.D. Gee, BBO #708219
JACKSON LEWIS P.C.
75 Park Plaza, 4TH Floor
Boston, MA 02116
(617) 367-0025
Erik.Winton@jacksonlewis.com
Garrett.Gee@jacksonlewis.com

(*Motion for Pro Hac Vice forthcoming*)
John M. Remy (VA Bar #65863)
Jackson Lewis P.C.
11790 Sunrise Valley Drive, Suite 400
Reston, VA 20191
(703) 483-8300
John.Remy@jacksonlewis.com