**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| A.W.G. DEWAR, INC. and INTACT INSURANCE GROUP USA, LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>MOLLY MASTRIANNI,<br><br>*Defendant.* | Case No. 26-14269 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND EXPEDITED DISCOVERY**

## I. INTRODUCTION

Plaintiff A.W.G. Dewar, Inc. ("Dewar") is the nation's preeminent tuition refund insurance provider. Defendant Molly Mastrianni ("Defendant") is a disgruntled former employee of Dewar who was terminated for poor performance. Just five days after her termination, Defendant accessed Dewar's password-protected Constant Contact database without authorization. The only possible reason for doing so was to gain access to Dewar's confidential information and trade secrets, including the identities of the limited number of private schools that purchase or are interested in purchasing tuition refund insurance, and the decision-makers at those schools. This information took Dewar years and millions of dollars to develop.

Shortly thereafter, in May 2026, Defendant began work for Vertical Insure, Inc.("Vertical") as its School Partnership & Growth Lead. Vertical is a new entrant into the tuition refund insurance market and seeks to compete directly with Dewar.[1] Vertical inevitably hired Defendant because of her purported customer relationships, customer intelligence, and industry knowledge that she

[1] Defendant had only approximately 3.5 years of experience in the field, yet she obtained a senior-level role with Vertical.

obtained—and misappropriated—from Dewar's computer system. Indeed, Defendant has used Dewar's confidential and proprietary information since joining Vertical to solicit multiple Dewar customers and unfairly compete with Dewar. Given that only about 4% of private schools purchase tuition refund insurance—out of a market of 30,000 schools—Defendant could not have randomly started to contact Dewar customers that she had not exposure to during her employment with Dewar.

Immediate injunctive relief is essential. The tuition refund insurance market is largely seasonal, and the upcoming school enrollment and renewal season is imminent. Each day that Defendant is permitted to use Dewar's confidential and proprietary information that she misappropriated to solicit Dewar's current and prospective clients inflicts irreparable competitive harm in a market with approximately 1,200 potential customers. The harm is compounding and cannot be adequately remedied by money damages alone.

Therefore, this Emergency Motion seeks relief that would allow Dewar to preserve evidence it needs to prove its claims and to quickly obtain evidence necessary to protect its confidential and proprietary information, goodwill, and business. While Dewar has taken active and diligent steps to protect itself and its confidential information after discovering Defendant's conduct, it cannot fully protect itself unless it can immediately preserve the electronic evidence and obtain discovery concerning what of Dewar's confidential information was taken and remains at risk.

Dewar requests the following relief by its Emergency Motion:

> 1. First, because much of the evidence of Defendant's conduct is likely electronic and solely within her or her new employer Vertical's control, Dewar seeks an order requiring Defendant not only to preserve all potentially discoverable evidence, but that she cause Vertical to create and escrow a forensic copy of all electronic devices with potentially discoverable information. In addition, the Court should require Defendant to either provide to Dewar any electronic device she possesses that contains Dewar's information or provide such devices to a forensic vendor so that Dewar's information can be forensically identified and permanently

removed.

2. Second, in order to prevent further irreparable harm, Dewar seeks an order from the Court that Defendant comply with her statutory and common law obligations and immediately cease and desist from using or disclosing any of Dewar's information. This includes not contacting any Dewar clients for any purposes and not sharing Dewar's trade secrets with anyone at Vertical.

3. Third, because the scope of Defendant's conduct is unknown and continues to cause Dewar ongoing irreparable harm, Dewar seeks an Order requiring Defendant to produce discovery and to be deposed on an expedited basis, and that permits Dewar to take expedited discovery of Vertical and Constant Contact via third-party subpoenas.

## II. FACTS[2]

### A. The Specialized Tuition Refund Insurance Market.

The private school tuition refund insurance market is a highly specialized niche within the broader property and casualty insurance industry. (Lower Decl. ¶ 3.) Unlike traditional insurance lines, tuition refund insurance is specifically designed for educational institutions, particularly independent schools, private schools, and boarding schools. (Lower Decl. ¶ 4.) There are approximately 30,000 private schools in the United States, but only approximately 1,200—or 4%—utilize this specialized insurance product. (Lower Decl. ¶ 8.) Because the potential customer base is so limited, successful underwriting and marketing depend upon detailed knowledge of which schools maintain tuition refund programs, when contracts are renewed, and who within each institution is responsible for purchasing decisions. (Lower Decl. ¶ 9.) Developing those relationships requires years of industry experience, targeted marketing efforts, and sustained interaction with school personnel. (Lower Decl. ¶ 10.)

Knowledge regarding existing customers, prospective customers, key decision-makers, renewal schedules, and pricing strategies possess substantial competitive value. (Lower Decl. ¶

[2] The factual allegations in this Memorandum mirror those in the Declaration of Ragan Lower (the "Lower Decl."), attached hereto as **Exhibit 1**.

15.) A competitor with access to that information could target solicitation efforts far more effectively than a competitor forced to cold call 30,000 schools to determine which 4% are interested. (Lower Decl. ¶ 16.)

**B. Dewar's Relevant Business.**

Dewar is the preeminent tuition refund insurance provider in the country, insuring approximately 1,100 of the approximately 1,200 schools that purchase such coverage. (Lower Decl. ¶ 20.) Dewar has developed substantial goodwill with its current and prospective customers: the average customer relationship is approximately 33 years. (Lower Decl. ¶ 21.) Dewar's success depends on its ability to identify prospective institutional clients, maintain long-term relationships with existing school accounts, and understand the specific operational and financial needs of individual educational institutions. (Lower Decl. ¶ 22.)

To that end, Dewar has spent millions of dollars developing and compiling information concerning existing customers, prospective customers, renewal opportunities, decision-makers, and schools' insurance requirements; its list of current customers alone is worth millions of dollars to a competitor. (Lower Decl. ¶ 24.) That information, and the secrecy thereof, is directly relevant to Dewar's ability to compete and grow its business. Such information also enables Dewar to target marketing efforts, service existing accounts, and pursue new business opportunities more effectively. (Lower Decl. ¶ 25.) Its business model depends not only on underwriting expertise, but also on maintaining and expanding relationships within the educational community and leveraging its knowledge of institutions that are potential purchasers of tuition refund coverage. (Lower Decl. ¶ 27.)

**C. Defendant's Job At Dewar.**

Dewar hired Defendant as an Account Executive on or about July 18, 2022. (Lower Decl. ¶ 28.) In that role, she acted as a principal point of contact between Dewar and approximately 119

of its existing customers. (Lower Decl. ¶ 30.) Through her position, Defendant obtained access to extensive trade secret, confidential, and proprietary information belonging to Dewar, including the identities of existing and prospective customers, decision-makers, purchasing histories, renewal schedules, pricing information, business and sales strategies, and competitive intelligence. (Lower Decl. ¶¶ 32–33.) Defendant did not bring any connections or prospective customers to Dewar when she began her employment; she had just finished an advanced degree related to teaching and had not previously worked in the tuition refund insurance industry. (Lower Decl. ¶¶ 44–45.)

During her employment, Defendant utilized Dewar's goodwill, customer relationships, and marketing databases, including Constant Contact. (Lower Decl. ¶ 35.) Constant Contact is a password-protected database containing the identities and contact and marketing information for all of Dewar's current and prospective customers. (Lower Decl. ¶ 37.) Only three people at Dewar have access to Constant Contact, all of whom are more senior than Defendant; Defendant was the only Account Executive at her level with access, which she received when her supervisor went on leave, so she could manage marketing campaigns during that time. (Lower Decl. ¶¶ 36, 38.) Constant Contact contains detailed information, including customer names, prospective customer names, individual contacts, titles, email addresses, mailing addresses, and other information compiled through substantial time, effort, and expense. (Lower Decl. ¶ 40.)

Dewar treats the information in Constant Contact as confidential and takes reasonable measures to protect it, including password protections, limiting employee access, maintaining confidentiality policies, and requiring employees to maintain the confidentiality of proprietary information. (Lower Decl. ¶¶ 48–49.) Defendant was made aware of these policies through the employee handbook and related employment materials. (Lower Decl. ¶ 50.)

### D. Defendant's Termination And New Employment.

After years of underperformance, Dewar terminated Defendant's employment on or about April 17, 2026 for poor performance. (Lower Decl. ¶¶ 58–59.) Following her termination, Dewar deactivated Defendant's internal login credentials and her Dewar-owned computer. (Lower Decl. ¶ 60.) However, five days after her termination, on April 22, 2026, Defendant accessed Dewar's Constant Contact account when she "discovered" that her Dewar login credentials still worked. (Lower Decl. ¶ 61, Ex. A.)

During her unauthorized access, Defendant had access to and misappropriated the identities of educational institutions that were Dewar's current and prospective customers, each contact at those institutions, each contact's job title, and each contact's email address. (Lower Decl. ¶ 62.) Defendant had no legitimate purpose to access Constant Contact. (Lower Decl. ¶ 63.) When questioned, Defendant could not provide any logical excuse or explanation and simply stated that she "discovered that [her] former login credentials remained active" and that, after realizing she still had access, she "immediately exited the account." (Lower Decl. ¶ 63, Ex. B.)

### E. Vertical's Relevant Business.

Shortly after her termination, Defendant began working for one of Dewar's newest competitors, Vertical Insure, Inc. ("Vertical"). (Lower Decl. ¶ 64.) Vertical is a relatively recent entrant into the tuition refund insurance industry, having been founded in or around 2022. (Lower Decl. ¶ 66.) Vertical competes directly with Dewar for relationships with educational institutions that purchase or are considering tuition refund insurance products. (Lower Decl. ¶ 68.) Information concerning the identities of schools that currently purchase tuition refund insurance, schools that are prospective purchasers of tuition refund insurance, the timing of policy renewals, the identities of individuals responsible for purchasing decisions, schools' historical purchasing practices,

schools' coverage preferences, and other customer-specific information would be highly valuable to Vertical in competing against Dewar. (Lower Decl. ¶ 75.)

**F. Defendant's Employment With Vertical.**

Vertical hired Defendant in or around May 2026 as its School Partnerships & Growth Lead for its tuition refund insurance business. (Lower Decl. ¶ 80.) Her new position involves responsibilities substantially similar to those she performed for Dewar. (Lower Decl. ¶ 81.) The confidential information and trade secrets to which Defendant had access during her employment—and which she misappropriated after her termination through unauthorized access to Constant Contact—would be directly useful to Vertical in competing against Dewar and soliciting business from educational institutions. (Lower Decl. ¶ 79.) In fact, during her employment at Vertical she has contacted multiple Dewar customers to solicit their business using Dewar's confidential information. (Lower Decl. ¶ 83-84.)

## III. LEGAL ARGUMENT

By its Emergency Motion, Dewar is seeking two forms of relief: (1) a temporary restraining order; and (2) expedited discovery. The facts and law support the issuance of both forms of relief.

**A. A Temporary Restraining Order Is Supported By The Evidence Before The Court.**

The Court should issue a temporary restraining order because Dewar can demonstrate that: (1) it is likely to succeed on the merits of its case; (2) there is a risk that irreparable injury will occur if the injunction is not granted; (3) the balance of hardships favors the issuance of the injunction; and (4) public policy supports the issuance of injunctive relief. *See Oxford Global Resources, Inc. v. Guerriero*, 2003 U.S. Dist. LEXIS 23503, at *11 (D. Mass. Dec. 20, 2003); *Packaging Industries Group, Inc. v. Cheney*, 380 Mass. 609, 617 (1980) (well-settled that the likelihood-of-success-on-the-merits prong of the test for injunctive relief is the most important for

the court to consider); *New Comm. Wireless Servs. v. Sprintcom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) (noting "[t]he sine qua non of th[e] four-part inquiry [regarding the issuance of injunctive relief] is likelihood of success on the merits. . ." *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993)).

Dewar's Complaint seeks relief for Defendant's misuse of confidential information and violation of statutory and common law. The injunctive relief requested on this preliminary basis is designed to preserve the *status quo*, preserve evidence, return Dewar's confidential information, and require Defendant to comply with her legal obligations. The evidence submitted here, including the Lower Decl. and the exhibits thereto, establish that the Court should grant this limited injunctive relief because Dewar is able to demonstrate that it is likely to succeed on the merits of its legal claims and granting the injunctive relief requested poses no substantial risk of harm to Defendant. *EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 581 (1st Cir. 2001) (injunctive relief is proper when the petitioner is likely to prevail on the merits of the case and can demonstrate both that the requested relief is necessary to prevent irreparable harm and that granting the injunction poses no substantial risk of harm to the opposing party)

### 1. Dewar Is Likely To Succeed On The Merits Of Its Case.

#### a. Defendant Misappropriated Dewar's Confidential And Proprietary Information.

The totality of the evidence strongly suggests that Defendant accessed and misappropriated Dewar's confidential and proprietary information and later used it to benefit Dewar's competitor, Vertical, and interfere with Dewar's economic relationships. Indeed, Defendant admitted that she accessed Dewar's Constant Contact database following her termination. *See* Lower Decl. at ¶ 63, Ex. B. Her explanation that she "discovered that [her] former login credentials remained active" but "immediately exited the account" once she logged in strains credulity. *See id.* Indeed, she had absolutely no lawful reason to even attempt to access Dewar's Constant Contact database, nor was

she authorized to do so. *See id.* The only possible reason Defendant had for accessing Constant Contact is to gain access to Dewar's trade secrets and confidential information contained therein.

Dewar has also shown that it is likely to prevail on its claims that Defendant violated both the Defend Trade Secrets Act ("DTSA") and Massachusetts' statute on misappropriation of trade secrets. The DTSA allows "owners," such as Dewar, to sue for "misappropriation" of "trade secrets" that are "related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). For purposes of the DTSA, a trade secret is "all forms and types of financial, business, scientific, technical, economic, or engineering information . . . if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). "Misappropriation" includes "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" as well as "disclosure or use of a trade secret of another without express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret." 18 U.S.C. §§ 1839(5)(A), (B).

Massachusetts' statute on misappropriation of trade secrets, M.G.L. c. 93, § 42, provides that "[w]hoever embezzles, steals or unlawfully takes, carries away, conceals, or copies, or by fraud or by deception obtains, from any person or corporation, with intent to convert to his own use, any trade secret, regardless of value, shall be liable in tort." "Trade secret" is defined in M.G.L. c. 266, § 30(4) as "anything tangible or intangible or electronically kept or stored, which constitutes, represents, evidences or records a secret scientific, technical, merchandising, production or management information, design, process, procedure, formula, invention or

improvement." Misappropriation occurs when a defendant "used improper means, in breach of a confidential relationship, to acquire and use that trade secret." *Infinity Fluids, Corp. v. General Dynamics Land Sys.*, 2016 U.S. Dist. LEXIS 134613, at *26 (D. Mass. 2016).

Dewar will be able to show that Defendant violated both of these statutes. Dewar has taken reasonable measures to keep its proprietary information secret. Dewar requires employees to agree to its confidentiality policies, limits the number of employees who have access to its Constant Contact database, and requires employees to use unique usernames and passwords to access its systems. The information at issue, confidential information concerning its current and prospective customers that would allow a competitor to figure out which 1,200 of the 30,000 independent educational institutions in the United States have or are interested in tuition refund insurance, clearly falls within the definition of trade secret in both statutes. There is no public source identifying schools that purchase (or are prospects to purchase) tuition refund insurance. Of the 1,200 schools that purchase this insurance, Dewar sells to about 1,100 of them. It has taken Dewar years and millions of dollars to develop this highly confidential list of customers and prospective customers, including purchasing decision-makers at each school. It is almost a mathematical impossibility that Defendant started contacting Dewar's clients—the only explanation is that she used the information she obtained from accessing Dewar's Constant Contact account.

Defendant's actions were misappropriation under the DTSA and M.G.L. c. 93 § 42. As detailed in the Complaint and Lower Decl., with no reason to access Dewar's secure database, Defendant logged into Dewar's Constant Contact database and accessed highly confidential and sensitive customer information. Defendant accessed this information on April 22, 2026, 5 days after she was terminated (further emphasizing that she had no legitimate reason to access Dewar's secure computer systems), and either while she was already working for Vertical or on the cusp of

commencing employment. Defendant admits to accessing Dewar's Constant Contact database following her termination. *See* Lower Decl., ¶ 63, Ex. B. Based on these facts alone, Dewar is likely to prevail on the merits of its misappropriation claims under federal and state statutory law and common law.

**b. Defendant Interfered With Dewar's Advantageous Business Relationships.**

Furthermore, the evidence also establishes that Defendant has interfered, intentionally or tortiously, with Dewar's advantageous economic relationships. *See, e.g.,* Lower Decl. ¶ 83. To state a claim for tortious interference with advantageous relations, a plaintiff need only establish that "(1) he had an advantageous relationship with a third party (e.g., a present or prospective contract or [business] relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive and means; and (4) the plaintiff was harmed by the defendant's actions." *Brown v. Suffolk Univ.*, 2021 U.S. Dist. LEXIS 126709, at *20-21 (D. Mass., March 31, 2021) (quoting *Hamann v. Carpenter*, 937 F.3d 86, 93 (1st Cir. 2019)) (alterations in original). With respect to the third element, improper motive exists when a defendant exhibits "actual malice" or "a spiteful, malignant purpose, unrelated to [a] legitimate corporate interest." *King v. Driscoll*, 418 Mass. 576, 587, 638 N.E.2d 488 (1994); *see also Cavicchi v. Koski*, 67 Mass. App. Ct. 654, 658, 855 N.E.2d 1137 (2006) ("[E]vidence of retaliation or ill will toward the plaintiff will support the claim.").

Dewar has longstanding[3] advantageous business relationships with all its customers. *See* Lower Decl. at ¶ 21. Defendant, through her employment with Dewar and theft of Dewar's confidential information, was aware of those advantageous relationships. Using the information

[3] The average length of Dewar's customer relationship is 33 years. Lower Decl. at ¶ 21.

she misappropriated from Dewar's database, Defendant has knowingly solicited multiple Dewar customers to thwart Dewar's relationship and unfairly compete with Dewar. *See* Lower Decl. at ¶¶ 30, 32-37, 83. Defendant, Dewar's disgruntled former employee, solicited Dewar's customers—using the confidential information she stole from Dewar—not only to benefit herself and her new employer, but in an active attempt to harm Dewar. Defendant's actions have, in fact, harmed Dewar in ways that are not yet ascertainable or calculable and which are not compensable solely by money damages. Therefore, based on these facts alone, Dewar has a likelihood of success on its claim for interference with advantageous business relationships.

**c. Defendant, Without Authorization, Accessed Dewar's Secure Computer System And Stole Its Confidential Information In Violation Of The Compute Fraud And Abuse Act ("CFAA").**

Five days after Dewar terminated Defendant's employment, without authorization, she accessed Dewar's Constant Contact database and misappropriated Dewar's secret information. (Lower Decl. ¶ 61.) Thus, she violated the CFAA.[4]

To establish a violation of the CFAA, a plaintiff need only show that the defendant has "intentionally accessed a computer [or computerized communication system] without authorization or exceeds authorized access, and thereby obtain[ed] . . . information from any protected computer." *T.H. Glennon Co.*, 2020 U.S. Dist. LEXIS, at *24 (quoting 18 U.S.C. § 1030(a)(2)(C)) (alterations in original); *see United States v. Mitra*, 405 F.3d 492, 496 (7th Cir. 2005 (stating the CFAA also covers computerized communication systems). Stated differently, Dewar need only show that (1) Defendant intentionally accessed a "protected computer"; (2) she was not authorized to do so; and (3) her access was to further her intended fraud and obtain

[4] "Although the [CFAA] is primarily a criminal statute, a person may bring a civil action so long as the person has suffered 'damage or loss by reason of a violation' of the CFAA.'" *T.H. Glennon Co. v. Monday*, 2020 U.S. Dist. LEXIS 45917, at *24 (D. Mass., March 17, 2020) (quoting 18 U.S.C. § 1030(g)).

Dewar's confidential and proprietary information. *See* 18 U.S.C. §1030(a)(4).

A "protected computer" is any computer with internet access because "'the internet is an instrumentality of interstate commerce.'" *T.H. Glennon Co.*, 2020 U.S. Dist. LEXIS, at *26 (quoting *United States v. Trotter*, 478 F.3d 918, 921 (8th Cir. 2007)). The term "further the intended fraud and obtain anything of value" is defined broadly to include "the actions that resulted in the acquisition of any kind of proprietary, useful date, including confidential information." *Id.* (citations omitted). The phrase "without authorization" is not defined, "but this Court has previously held that it should be read broadly to include an employee who accesses his employer's computer, without the employer's knowledge, to acquire an interest adverse to his employer." *Viken Detection Corp. v. Videray Techs. Inc.*, 384 F. Supp. 3d 168, 178 (D. Mass. 2019) (citing *Guest-Tek Interactive Entm't, Inc. v. Pullen*, 665 F. Supp. 2d 42, 45 (D. Mass. 2009), in turn citing, *EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 582-84 (1st Cir. 2001)). To "exceed authorized access" is to "use such access to obtain or alter information in the computer that the accessor is not entitled so to obtain or alter." *Id.* (citing 18 U.S.C. § 1030(e)).

Here, Dewar terminated Defendant's employment on April 17, 2026. (Lower Decl. at ¶ 59.) From the time she was informed of her termination, she was no longer authorized to access any of Dewar's computer systems. (Lower Decl. at ¶ 59.) Defendant has admitted that she intentionally accessed Dewar's Constant Contact database on April 22, 2026. (Lower Decl. ¶ 63, Ex. B.) As explained above, Dewar maintains sensitive information in its Constant Contact database, including trade secret and confidential information. (Lower Decl. ¶¶ 40-41.) During her unauthorized access, Defendant stole Dewar's confidential information. Dewar did not consent to nor give Defendant permission to access its protected computer system after her termination. *See* Lower Decl. ¶ 59. She has since used the confidential information in a way adverse to Dewar's

interests—i.e., unfairly competing with Dewar and interfering with its business relationships. The value of the information Defendant stole when accessing Dewar's computer system far exceeds $5,000. *See* Lower Decl. ¶ 83. Therefore, based on the foregoing, Dewar also has a substantial likelihood of success on the merits of its CFAA claim.

**2. Dewar Will Suffer Irreparable Harm If The Injunctive Relief Is Not Granted.**

To establish irreparable harm, "'a plaintiff need not demonstrate that the denial of injunctive relief will be fatal to its business.'" *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996). "It is usually enough if the plaintiff shows that its legal remedies are inadequate . . . . If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel . . . . Thus, a cognizable threat of such harm can support a restraining order." *Id.* at 18.

"A plaintiff experiences irreparable injury if there is no adequate remedy at final judgment." *GTE Products Corp. v. Stewart*, 414 Mass. 721, 724 (1993). Indeed, besides the difficulty in quantifying its economic loss, Massachusetts courts have held that the disclosure of confidential information ***alone*** constitutes irreparable harm. *See, e.g., Picker Int'l Corp. v. Imaging Equip. Servs., Inc.*, 931 F. Supp. 18, 44 (D. Mass. 1995) ("The misuse of trade secrets is generally deemed to involve irreparable harm"); *Modis, Inc. v. Revolution Group, Ltd.*, 1999 Mass. Super. LEXIS, at *26-27 (Mass. Super. Ct., Dec. 29, 1999) (holding that loss of confidential information constitutes irreparable harm).

Dewar's confidential and proprietary information resides on its computers, including valuable customer identities, contact information, and other sensitive information about potential clients. This valuable confidential information in the hands of a direct competitor could result and may have already resulted in unfair competitive advantages for Vertical, which would cause

irreparable harm to Dewar. *Marcam Corp. v. Orchard and Datalogix Int'l, Inc.*, 885 F. Supp. 294, 297 (D. Mass. 1995) (finding that harm cannot be avoided simply by a former employee's intention or efforts to not disclose confidential information since "what [the employee] knows . . . is bound to influence what he does for [the new employer], and to the extent it does, [plaintiff] will be disadvantaged").

If injunctive relief is not granted, Dewar will face the substantial risk of immediate and irreparable harm including but not necessarily limited to the following:

a. the disclosure, whether directly or indirectly, of Dewar's proprietary and/or confidential information;

b. the diversion of Dewar's business and business opportunities;

c. the disruption of Dewar's longstanding relationships with current customers and relationships with prospective customers;

d. the usurpation of Dewar's goodwill with current and prospective customers;

e. unfair competition; and

f. present economic loss which is unascertainable at this time and may never be ascertainable, as well as future economic loss which is also presently incalculable.

Accordingly, the Court should enter the requested injunctive relief.

### 3. The Balance Of Hardships Weighs Decisively In Dewar's Favor.

The potential injury to Dewar outweighs any harm that granting injunctive relief may cause Defendant. Quite simply, no harm to Defendant can result from the requested relief. In contrast, the harm to Dewar is obvious and potentially extremely serious—the use and disclosure of Dewar's information, including but not limited to confidential business information to gain a competitive advantage against and inflict economic harm on Dewar. If Defendant is allowed to possess Dewar's proprietary and/or confidential information and potentially disclose such information, the economic damage to Dewar could be severe.

### 4. Public Policy Supports Injunctive Relief.

The public policy in protecting against corporate espionage and trade secret theft is reflected in the DTSA and G.L. c. 93, § 42. It cannot be disputed that Defendant had no authority to misappropriate Dewar's confidential and proprietary information and trade secrets for her own and/or Vertical's benefit. There is no countervailing compelling public policy in Defendant's favor, especially since Dewar seeks injunctive relief only to preserve the *status quo* and require Defendant to comply with her existing statutory and common law obligations. Therefore, the public interest is satisfied by the issuance of the requested relief.

### 5. The Relief Requested Is Reasonable.

Dewar is requesting only a limited temporary restraining order and preliminary injunction that directly address the conduct that has occurred, returns Dewar's information to Dewar, preserves evidence, and requires Defendant to comply with her legal obligations. This relief is narrow and reasonable and would require Defendant to:

- Preserve all potentially discoverable evidence, and cause Vertical to create and escrow a forensic copy of all electronic devices with potentially discoverable information;
- Return to Dewar any electronic device she possesses that contains Dewar's information or provide that device to a forensic vendor so that Dewar's information can be forensically identified and permanently removed; and
- Comply with her statutory and common law obligations and immediately cease and desist from using or disclosing any of Dewar's information including the contacting of any Dewar customers.

## A. The Court Should Permit Dewar To Take Expedited Discovery To Support A Motion For Preliminary Injunction, And So Dewar Can Avoid Further Irreparable Harm.

Dewar seeks expedited discovery that will allow the parties and the Court to resolve the present issues more quickly. Such discovery may also provide Dewar a far better opportunity to

limit any damage that is being done to its business as a result of Defendant's conduct.

Under Rule 26(d) of the Federal Rules of Civil Procedure, a court has the discretion to order the parties to commence discovery prior to the Rule 26(f) Conference. *See* Fed. R. Civ. P. 26(d) ("A party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except . . . when authorized by these rules, by stipulation, or by court order."). To obtain such an order, a party need only show good cause for expedited discovery. *Momenta Pharmaceuticals, Inc. v. Teva Pharmaceuticals Indus., Ltd.*, 765 F. Supp. 2d 87, 88 (D. Mass. 2011). In determining whether good cause exists for expedited discovery, courts analyze the "reasonableness of the request in light of all of the surrounding circumstances." *Id.*,765 F. Supp. 2d at 89 (quoting *Entm't Tech. Corp. v. Walt Disney Imagineering*, 2003 U.S. Dist. LEXIS 19832, at *10 (E.D. Pa. 2003)).

The factors that weigh in this analysis include, but are not limited to, "the purpose for the discovery, the ability of the discovery to preclude demonstrated irreparable harm, the plaintiff's likelihood of success on the merits, the burden of discovery on the defendant, and the degree of prematurity." *McMann v. Doe*, 460 F. Supp. 2d 259, 265 (D. Mass. 2006). "Expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of the injunctive proceedings." *Ellsworth Assocs., Inc. v. United States*, 917 F. Supp. 841, 844 (D.D.C. 1996); *see also Sergio Juan v. LaRosa Del Monte Express, LLC*, 2005 Mass. Super. LEXIS 535, *7-8 (Oct. 28, 2005) (request for expedited discovery is one that "can be easily dealt with"). Where, as here, a party's ability to obtain effective relief may be dependent on its ability to obtain (or refute) injunctive relief, expedited discovery necessary to pursue that relief should be allowed. *See Acordia Northeast, Inc. v. Academic Risk Res. & Ins., LLC*, 19 Mass. L. Rep.108, 2005 Mass. Super. LEXIS 130, *2-3 (Jan. 13, 2005) (Burnes, J.) (granting expedited discovery

following a TRO for the purpose of determining if injunctive relief should continue).

Dewar has good cause for the limited expedited discovery it is seeking. *See* **Exhibit 2** (Expedited Requests for Production); **Exhibit 3** (Expedited Interrogatories); **Exhibit 4** (Expedited Subpoena to Constant Contact); and **Exhibit 5** (Expedited Subpoena to Vertical). Indeed, Dewar's rationale for requesting expedited discovery is straightforward: Dewar has evidence that Defendant accessed its Constant Contact database after her termination and reasonably believes she stole its confidential and proprietary information to unfairly compete with and cause harm to Dewar. While Dewar's investigation is ongoing, it is concerned that it has not identified the scope of the misappropriation of its confidential information, and it needs expedited discovery to do so.

Dewar anticipates seeking preliminary injunctive relief to protect its rights and stop further irreparable harm, and requests discovery to learn the full extent of Defendant's conduct, so that Dewar can seek injunctive relief that is appropriate to protect its interests. Because Dewar is legitimately concerned that it will continue to suffer harm that is likely to be irreparable absent injunctive relief, it should be permitted to take discovery on an expedited basis so that it can promptly move for injunctive relief.

## IV. CONCLUSION

For the reasons set forth above, Dewar requests the Court grant this Emergency Motion for Temporary Restraining Order and Expedited Discovery.

Date: September 17, 2026

Respectfully Submitted,

A.W.G. Dewar, Inc. and Intact Insurance Group USA LLC

By their attorneys,

*/s/Garrett A.D. Gee*
Erik J. Winton, BBO #600743
Garrett A.D. Gee, BBO #708219
JACKSON LEWIS P.C.
75 Park Plaza, 4TH Floor
Boston, MA 02116
(617) 367-0025
Erik.Winton@jacksonlewis.com
Garrett.Gee@jacksonlewis.com

(*Motion for Pro Hac Vice forthcoming*)
John M. Remy (VA Bar #65863)
Jackson Lewis P.C.
11790 Sunrise Valley Drive, Suite 400
Reston, VA 20191
(703) 483-8300
John.Remy@jacksonlewis.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of September, 2026, the foregoing document, filed through this Court's CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and a paper and/or electronic copy shall be served on non-registered participants pursuant to applicable rules.

*/s/Garrett A.D. Gee*
Jackson Lewis P.C.

4918-0496-5583, v. 3