# <u>EXHIBIT 1</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| A.W.G. DEWAR, INC. and INTACT INSURANCE GROUP USA, LLC,<br><br>*Plaintiffs*,<br><br>v.<br><br>MOLLY MASTRIANNI,<br><br>*Defendant.* | Case No. 1:26 |

**DECLARATION OF RAGAN LOWER**

I, Ragan Lower, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I, submit this declaration in support of Plaintiffs A.W.G. Dewar, Inc. and Intact Insurance Group USA, LLC's Emergency Motion for Temporary Restraining Order and Expedited Discovery. I have personal knowledge of the matters set forth herein, except as to those matters stated upon information and belief, and as to those matters, I believe them to be true. If called upon to testify, I could and would competently testify to the facts set forth in this declaration.

2. I am the President of A.W.G. Dewar, Inc. ("Dewar"). I am familiar with Dewar's business, including its operations in the tuition refund insurance market, its customer relationships, its confidential and proprietary information, and Defendant Molly Mastrianni's ("Defendant") employment with Dewar.

**THE SPECIALIZED TUITION REFUND INSURANCE MARKET**

3. The private school tuition refund insurance market is a highly specialized niche within the broader property and casualty insurance industry.

4. Unlike traditional personal or commercial insurance lines that are marketed to broad segments of consumers and businesses, tuition refund insurance is specifically designed for educational institutions, particularly independent schools, private schools, and boarding schools.

5. The product protects against the financial consequences associated with student withdrawals, dismissals, or other covered events that may interrupt enrollment and affect tuition obligations.

6. As a result, insurers operating in this sector must possess specialized knowledge regarding school operations, enrollment practices, tuition contracts, retention risks, and the financial structures used by educational institutions.

7. Participation in this market requires more than general insurance expertise.

8. There are approximately 30,000 private schools in the United States. However, only approximately 1,200—or 4%—of those schools utilize this specialized insurance product.

9. Because the potential customer base is limited to a fractional subset of educational institutions, successful underwriting and marketing depend upon detailed knowledge of which schools maintain tuition refund programs, which schools do not currently offer such coverage, when tuition contracts are renewed, and who within each institution is responsible for insurance purchasing decisions.

10. Developing these relationships often requires years of industry experience, targeted marketing efforts, attendance at educational-industry conferences, and sustained interaction with school administrators, business officers, and risk-management personnel.

11. Likewise, developing prospective customers requires years of educating the customer about the value of the insurance product, identifying the correct personnel at the schools on whom to focus these efforts, and overcoming years of institutional practice of not having this insurance.

12. The value of the information described above derives not merely from identifying schools generally, but from knowing which institutions are current or prospective purchasers of tuition refund insurance and understanding their particular coverage needs.

13. Because the market is limited and specialized, opportunities to obtain new clients are correspondingly scarce.

14. Unlike mass-market insurance products that may be sold through broad advertising or large broker networks, tuition refund insurance providers compete for a finite number of schools and educational institutions.

15. Knowledge regarding existing customers, prospective customers, key decision-makers, renewal schedules, pricing strategies, and schools that may be considering changing providers possess substantial competitive value within the industry.

16. A competitor with access to such information would be able to target solicitation efforts more effectively than a company lacking comparable market intelligence. For example, a competitor without this information would be required to cold call 30,000 schools to determine which 4% of them are likely to be interested in this insurance product, in addition to determining which school official is the appropriate contact point.

17. In short, tuition refund insurance is not a general insurance product sold to the public at large. It is a specialized insurance line serving a narrowly defined segment of the educational sector, and success within that market depends heavily on specialized industry knowledge, long-standing customer relationships, and familiarity with a limited pool of potential clients.

## DEWAR'S RELEVANT BUSINESS

18. Within the tuition refund insurance market, Dewar's business centers on developing, marketing, and servicing tuition refund programs for educational institutions throughout the United States.

19. Dewar maintains relationships with schools that offer tuition refund protection to enrolled families and works directly with educational institutions concerning policy placement, renewals, coverage administration, and claims arising from student withdrawals or dismissals.

20. Dewar is the preeminent tuition refund insurance provider in the country. Of the approximately 1,200 schools opting for such coverage, Dewar insures approximately 1,100 of those schools.

21. The average customer relationship is approximately 33 years.

22. Dewar's success depends on its ability to identify prospective institutional clients, maintain long-term relationships with existing school accounts, and understand the specific operational and financial needs of individual educational institutions.

23. To ensure success, Dewar's personnel work with school administrators and other decision-makers responsible for evaluating, selecting, and renewing tuition refund insurance programs. Because tuition refund insurance is sold on an institutional basis, Dewar's business relies heavily on account development, customer retention, and knowledge of schools' purchasing practices.

24. Dewar has spent millions of dollars developing and compiling information concerning existing customers, prospective customers, renewal opportunities, decision-makers, and schools' insurance requirements. Dewar's list of current customers, standing alone, is worth millions of dollars to a competitor.

25. That information, and the secrecy thereof, is directly relevant to Dewar's ability to compete and grow its business. Such information also enables Dewar to target marketing efforts, service existing accounts, and pursue new business opportunities more effectively.

26. In addition, Dewar has developed a significant presence in the educational-services market through the offering of Tuition Refund Plans to private schools.

27. Its business model depends not only on underwriting expertise, but also on maintaining and expanding relationships within the educational community and leveraging its knowledge of institutions that are potential purchasers of tuition refund coverage.

## DEFENDANT'S JOB AT DEWAR

28. Dewar hired Defendant as an Account Executive on or about July 18, 2022.

29. As an Account Executive, Defendant was responsible for managing existing school accounts, developing new business opportunities, and servicing educational institution clients within her assigned territory.

30. In that role, Defendant acted as a principal point of contact between Dewar and approximately 119 of its existing customers.

31. Defendant used Dewar's goodwill to develop and maintain relationships with educational institutions that purchased or were prospective purchasers of Dewar's Tuition Refund Plan products.

32. Through her position, Defendant obtained access to extensive trade secret, confidential, and proprietary information belonging to Dewar that was not generally known to the public or readily ascertainable by competitors.

33. Among other things, Defendant had access to Plaintiffs' confidential information including the identities of Dewar's existing customers and prospective customers, in addition to the identity of decision-makers at current customers, customer preferences, purchasing histories, renewal schedules, business opportunities, pricing information, business strategies, sales strategies, claims-related information, and competitive intelligence.

34. The information to which Defendant had access is non-public, including information identifying the specific educational institutions that purchased or were considering purchasing tuition refund insurance products, the individuals responsible for making purchasing decisions at those institutions, and information concerning those institutions' insurance needs, coverage preferences, budgets, and renewal timelines.

35. During her employment, Defendant utilized Dewar's goodwill, customer relationships, and marketing databases—including Constant Contact.

36. Defendant was the only Account Executive at her level to have access to Constant Contact. When her supervisor went out on leave, Defendant was given access, so she could manage the marketing campaigns.

37. Constant Contact is a password protected database containing the contact and marketing information for all of Dewar's current and prospective customers.

38. Only three (3) people at Dewar have access to Constant Contact, all of whom are more senior than Defendant.

39. To access Dewar's Constant Contact database, an employee must input their login credentials, which includes their official Dewar email address and a unique password.

40. Constant Contact contains detailed information regarding Dewar's customers and prospective customers, including customer names, prospective customer names, individual contacts, titles, email addresses, mailing addresses, and other information that Dewar had compiled and maintained through substantial time, effort, and expense.

41. Constant Contact also contains all of Dewar’s past and current email-marketing campaign materials.

42. Defendant used and had access to Constant Contact in connection with her duties managing marketing campaigns, customer relationships, developing new business opportunities, and servicing existing accounts while her supervisor was on leave.

43. Defendant also had access to information concerning prospective business opportunities, marketing initiatives, customer retention efforts, and strategic plans designed to increase Dewar’s market share within the tuition refund insurance industry.

44. Defendant did not bring any connections or prospective customers to Dewar when she began her employment, as she had just finished an advanced degree related to teaching.

45. Upon information and belief, Defendant had not previously worked in the tuition refund insurance industry.

46. The information to which Defendant had access derived independent economic value from not being generally known to Dewar's competitors. Such information allows Dewar to identify and contact prospective customers, maintain and expand existing customer relationships, target business opportunities, and compete effectively within a limited and highly specialized market.

47. Dewar developed and maintained this information through substantial investments of time, money, effort, and goodwill accumulated over many years of serving educational institutions throughout North America.

48. Dewar treated this information as confidential and took reasonable measures to protect it from unauthorized disclosure and use, including password protections and limiting the number of employees that could access the information.

49. Among other measures, Dewar maintained policies and procedures governing the use, protection, and disclosure of confidential business information and required employees to maintain the confidentiality of proprietary company information obtained during the course of their employment.

50. Defendant was made aware of Dewar’s confidentiality policies through the employee handbook and related employment materials provided during her employment.

51. Through her employment, Defendant understood that customer information, prospect information, pricing information, business strategies, renewal information, and other non-public business information belonged to Dewar, was confidential in nature, and was not to be disclosed or used for purposes other than advancing Dewar’s business interests.

52. By virtue of her position and tenure with Dewar, Defendant acquired specialized knowledge concerning Dewar’s customers, prospective customers, business operations, sales efforts, and strategic marketing initiatives that would be valuable to a competitor operating in the highly-specialized tuition refund insurance market.

53. Defendant used Dewar's substantial goodwill, on Dewar's behalf, with existing and prospective customers. Through repeated communications and ongoing account management responsibilities, Defendant became familiar with the needs, preferences, concerns, and purchasing practices of the schools she serviced.

54. The relationships Defendant made during her employment were developed through Dewar's substantial investments of time, money, resources, confidential information, and business opportunities and were maintained for Dewar's benefit.

55. As a result of her position, Defendant became familiar with the identities of key contacts at customer and prospective customer institutions, including those individuals responsible for evaluating, recommending, and purchasing tuition refund insurance products.

56. Defendant also became familiar with the timing of renewal opportunities, the competitive landscape surrounding particular accounts, customer satisfaction issues, and the factors that influenced purchasing decisions at individual schools.

57. Dewar entrusted Defendant with access to its confidential and proprietary information for the sole purpose of allowing her to perform her duties as an Account Executive and further Dewar's business interests.

## DEFENDANT'S TERMINATION AND NEW EMPLOYMENT

58. After years of underperformance and ample chance to implement the repeated feedback she received during her employment, Dewar determined that Defendant could not successfully perform as an Account Executive.

59. As such, on or about April 17, 2026, Dewar terminated Defendant's employment for poor performance. From this date, she was no longer authorized to access Dewar's confidential information.

60. Following her termination, Dewar deactivated Defendant's internal login credentials and her Dewar-owned computer.

61. However, five days after her termination, on April 22, 2026, Defendant accessed Dewar's Constant Contact account through her Dewar login credentials. The access log showing such access is attached hereto as **Exhibit A**.

62. Upon information and belief, during this unauthorized access, Defendant copied, exported, and/or otherwise misappropriated the identities of the educational institutions that were Dewar's current and prospective customers, each contact at the institutions, each contact's job title, and each contact's email address.

63. Defendant had no legitimate purpose to access Constant Contact. When questioned about her accessing Constant Contact post-termination, Defendant could not provide any logical excuse or explanation and simply stated that she "discovered that [her] former login credentials remained active following the termination of [her] employment" and that after realizing she still

had access she "immediately exited the account." Defendant's certification containing this admission is attached hereto as **Exhibit B**.

64. Upon information and belief, Defendant began working for one of Dewar's newest competitors, Vertical Insure, Inc. ("Vertical") shortly after leaving Dewar.

65. Upon information and belief, Defendant was hired for the experience she gained at Dewar in the tuition refund insurance industry.

## VERTICAL'S RELEVANT BUSINESS

66. Vertical is a relatively recent entrant into the tuition refund insurance industry, having been founded in or around 2022.

67. Upon information and belief, Vertical has actively sought to expand its presence within the tuition refund insurance market by offering tuition refund protection products and related services to private educational institutions throughout the United States.

68. Vertical competes directly with Dewar for relationships with educational institutions that purchase, administer, or are considering tuition refund insurance products.

69. Upon information and belief, Vertical's business strategy includes identifying, soliciting, and developing relationships with schools that currently maintain tuition refund programs, as well as schools that may be prospective purchasers of such coverage.

70. Upon information and belief, Vertical seeks to increase its market share by developing relationships with school administrators, business officers, enrollment personnel, chief financial officers, and other individuals responsible for evaluating and purchasing tuition refund insurance products on behalf of educational institutions.

71. Upon information and belief, Vertical has devoted substantial resources toward increasing its presence within the tuition refund insurance market and taking business from competitors servicing educational institutions that currently purchase or may purchase tuition refund insurance products.

72. Upon information and belief, because the tuition refund insurance market is limited to a relatively small number of educational institutions, each customer obtained by Vertical represents a significant competitive opportunity.

73. Upon information and belief, Vertical targets many of the same educational institutions that Dewar presently serves, has previously served, or seeks to serve.

74. Upon information and belief, Vertical's efforts to grow its business depend, at least in part, on identifying educational institutions that currently maintain tuition refund programs and persuading those institutions to select Vertical rather than competing providers.

75. Information concerning the identities of schools that currently purchase tuition refund insurance, schools that are prospective purchasers of tuition refund insurance, the timing of

policy renewals, the identities of individuals responsible for purchasing decisions, schools' historical purchasing practices, schools' coverage preferences, and other customer-specific information would be highly valuable to Vertical in competing against Dewar.

76. Access to such information would permit Vertical to focus its sales and marketing efforts on institutions known to be actual or likely purchasers of tuition refund insurance, thereby drastically reducing the time, expense, and resources otherwise required to identify and cultivate prospective customers.

77. As Vertical is a newer participant in the tuition refund insurance market, access to established customer relationships, prospective customer information, renewal information, and industry-specific market intelligence would provide Vertical with a substantial competitive advantage.

78. Vertical has publicly promoted itself as an alternative to established tuition refund insurance providers and has sought to attract schools that currently utilize competing tuition refund insurance products.

79. The confidential information and trade secrets to which Defendant had access during her employment with Dewar—and which she misappropriated after her termination through her unauthorized access to Dewar's Constant Contact database—including information concerning the identities of customers and prospective customers, the identities of decision-makers at customers and potential customers, purchasing contacts, renewal opportunities, and marketing strategies, would be directly useful to Vertical in competing against Dewar and soliciting business from educational institutions within the tuition refund insurance market.

## DEFENDANT'S EMPLOYMENT WITH VERTICAL

80. Upon information and belief, Vertical hired Defendant in or around May 2026 as its School Partnerships & Growth Lead for its tuition refund insurance business.

81. Upon information and belief, Defendant's new position involves responsibilities that are substantially similar to those she performed for Dewar and that will require her to call upon many of the same skills, relationships, and industry contacts that she developed while employed by Dewar.

82. Further, as a result of Defendant's misappropriation of Dewar's trade secrets and confidential and proprietary information, she possesses non-public information that she could use to unfairly benefit Vertical and disadvantage Dewar in competition for existing and prospective customers.

83. In fact, Defendant has solicited multiple of Dewar's current customers since joining Vertical.

84. Upon information and belief, Defendant, acting as an agent of Vertical, has revealed Dewar's trade secret, confidential, and proprietary information to her new employer, Vertical.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND INFORMATION. SIGNED THIS 16th DAY OF SEPTEMBER, 2026.

Ragan Lower

4933-8807-6495, v. 4

# Exhibit A

## My Account:

Account owner

Account details | Billing | Account emails | Manage users | Advanced settings | SMS | UTM tracking | Website tracking

### Manage users

Add New User

| Name | Email | Status | User Role | Last Login | |
|---|---|---|---|---|---|
| Molly Mastrianni | molly@dewarinsurance.com | Deactivated | Account manager | 4/22/2026, 12:19:32 PM | ··· |

# Exhibit B

intact INSURANCE specialty solutions

**A.W.G. DEWAR, INC.**
**RETURN OF PROPERTY ACKNOWLEDGEMENT & CERTIFICATION**

I, Molly Mastrianni, hereby certify as follows:

☒ I have returned all Dewar property, including but not limited to, computers, laptops, cellphones/smartphones, tablets, external hard drives, zip drives, flash drives, wireless cards, CDs/DVDs, cameras, documents, files, records, notebooks, inventory, prototypes, models, Dewar-related accounts and login/password information, and all confidential Dewar information (including but not limited to customer, prospective customer, distributor, broker, provider information) whether in paper or electronic format.

☒ I have permanently deleted all of Dewar's confidential information, including customer and prospective customer information from Constant Contact, from any personal device(s) or online account(s) in my possession or control, including but not limited to any personal computer, laptop, cellphone/smartphone, tablet, external hard drive, zip drive, flash drive, CD/DVD, webmail, cloud storage, social media site, or other online account or site within my possession or control.

**ACKNOWLEDGMENT**

I acknowledge that if I maintain, keep, use or disclose any Dewar property or information in a manner inconsistent with this certification, I will be doing so without authorization and in violation of Dewar policies and possibly state and/or federal law. I understand that my obligation to refrain from keeping or using any Dewar information continues beyond the end of my employment with Dewar.

7/7/2026
Date

[signature]
Signature

**CERTIFICATION**

☒ I have returned all Dewar property and information referenced above.

☒ I have permanently deleted all Dewar information from any personal device(s) or online account(s) in my possession or control.

☒ I have not retained, used, or disclosed any Dewar confidential or proprietary information to a third party.

7/7/2026
Date

[signature]
Signature

See attached Reservation of Rights and Factual Clarification which qualifies this signature and is incorporated as part of my acknowledgment.

**Reservation of Rights and Factual Clarification**

**Introduction**

I am providing this Reservation of Rights and Factual Clarification to accompany the Return of Property Acknowledgment & Certification so that the accompanying Certification accurately reflects the factual context in which it is being executed. While I am willing to certify the truth of the statements contained therein, I do not agree with the characterization of events contained in your June 5, 2026 correspondence.

## 1. Reservation of Rights

I expressly deny any allegation that I misappropriated, retained, used, disclosed, or transferred confidential or proprietary information belonging to Dewar Insurance Agency, LLC, or that I violated any legal or contractual obligation. Nothing in my execution of the Certification shall be construed as an admission of wrongdoing, liability, or breach of any duty. I expressly reserve all rights, claims, defenses, and legal positions with respect to the allegations contained in your June 5, 2026 correspondence.

## 2. Purpose of Certification

My execution of the Certification is made solely to confirm my compliance with my continuing obligations regarding confidential information and return of property. It is not intended to create any new contractual obligations or to restrict my lawful employment or lawful competition beyond any obligations otherwise imposed by applicable law.

## 3. Material Facts

- My employment with Dewar ended on April 17, 2026.
- On or about April 22, 2026, I discovered that my former login credentials remained active following the termination of my employment. Upon realizing access had not been disabled, I immediately exited the account. I did not download, export, copy, retain, transmit, or otherwise use any information from the account.
- During this same period, I requested and received my personnel file from Dewar.
- Following my separation, I remained ready and willing to return all company-issued equipment. After more than two weeks had passed without receiving the shipping materials necessary to do so, I contacted Intact to advise that I still had the equipment. Intact informed me that the return materials had been sent to an incorrect address. After confirming my address, I promptly returned all company property in accordance with Intact's instructions.

- At the time of the brief account access referenced in your correspondence, I had not accepted employment with Vertical Insure, interviewed with Vertical Insure, or engaged in discussions regarding employment with Vertical Insure.
- Your June 5,2026 correspondence states that a certified mailing was sent. I did not receive any certified correspondence from Dewar or Intact.
- I do not possess Dewar's confidential or proprietary information and have not retained, used, or disclosed such information.

4. **Continuing Obligations**

At all relevant times following my separation, I acted in good faith and voluntarily took steps to ensure Dewar's property was returned and my post-employment obligations were fulfilled. I do not possess Dewar's confidential or proprietary information, and I remain committed to honoring any continuing confidentiality obligations imposed by law.

**5. Clarification**

Nothing contained in my execution of the Certification should be interpreted as acknowledging the factual or legal characterization of events set forth in your June 5, 2026 correspondence. My Certification reflects only the truth of the statements I have made regarding my possession and use of confidential information.

**6. Closing**

This statement is made voluntarily to ensure that the factual record accompanying my Certification is complete and accurate. It should not be construed as expanding my obligations, waiving any rights or defenses, or adopting any characterization of events with which I disagree.

Molly Mastrianni
_______________________
Signature

Molly L. Mastrianni

7/7/2026
_______________________
Date